LAW OFFICES OF

# SUSAN C. WOLFE

1700 BROADWAY, 41ST FLOOR
NEW YORK, NEW YORK 10019

TEL  (917) 209-0441                                      Susan C. Wolfe, Esq.
EMAIL  scwolfe@scwolfelaw.com

Diane Fischer, Esq.
*Of Counsel*

April 20, 2022

**BY ECF**

Honorable Kenneth M. Karas
United States District Judge
United States Courthouse
300 Quarropas Street
White Plains, NY 10601

Re:  *United States v. Jeffrey Crossland*, 19 Cr. 645 (KMK)

Dear Judge Karas:

From a cursory look at Mr. Crossland's background — white male, upper-middle-class upbringing in the suburbs of Chicago, master's degree from the University of Southern California, M.B.A. from Harvard University, and fifteen years in investment banking for Prudential Securities – it would be logical to assume that this is the story of a successful financier who was motivated by simple greed. But that is not the case. Mr. Crossland's offense followed the loss of secure employment, the failure of a nascent career in real estate development, the depleting of his retirement savings, and the unraveling of his marriage. It was the first time in his life that his hard work and ambition had not led to success. Facing a confluence of setbacks and desperate to regain his footing, he made capricious and insupportable choices that left a trail of damage in their wake. As Mr. Crossland expresses in his letter to the Court, the loss of the victims' money as a result of his actions "is shameful to me and one I will regret for the rest of my life." *See* Exhibit A (Letter of Jeff Crossland).

On September 17, 2021, Mr. Crossland pleaded guilty, pursuant to a plea agreement, before Magistrate Judge Paul E. Davidson to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Mr. Crossland also executed a Preliminary Consent Order of Forfeiture in the amount of $37,873.00. After considering the sentencing factors under § 3553(a), we respectfully ask the Court to find that a sentence of no more than 24-months imprisonment, as recommended by the

Honorable Kenneth M. Karas, U.S.D.J.
Re: *United States v. Jeffrey Crossland*, 19 Cr. 645
April 20, 2022
Page 2

Probation Department, is sufficient but not greater than necessary to achieve the goals of sentencing in Mr. Crossland's case.

## Mr. Crossland's Background

Jeff Crossland was born on July 9, 1956, at the Waukegan Naval Hospital in Great Lakes, IL, to Paul and Nancy Crossland. His father was in the army in the early 1950s, and later became a C.P.A. at a large accounting firm, Alexander Grant & Co. (now Grant Thornton, LLP) in Chicago. Jeff and his three younger siblings – Jim, 64, Paul, 62, and Cynthia, 59 – grew up in an upper-middle-class household in the suburbs of Chicago and Los Angeles. Jeff's mother was a homemaker, and he recalls feeling loved and supported by his parents as a child. They were a close, religious family who regularly attended church services and were active in their community. When Jeff was eight years old, his father was promoted to a position in Alexander Grant & Co.'s Los Angeles office and the family relocated to Glendale, CA. Jeff has resided in Southern California ever since.

Jeff's brother Jim describes his older brother as someone who "just didn't make a lot of mistakes." His parents stressed academics and community engagement and they encouraged him to be a high achiever regardless of the endeavor. He was a boy scout and participated in school politics from elementary through high school. He played football, basketball, intramural sports, and drums in the school marching band. When Mr. Crossland was in middle school, he played in the Glendale youth football program, an organization his father started for local kids that eventually grew to over 400 participants throughout greater Los Angeles. Jeff became a skilled receiver and prized player on his high school football team. In his senior year, he received an award given to the student who had demonstrated exceptional athletic prowess and academic achievement. Jeff's father was his role model. While still in high school, Jeff expressed an interest in his father's profession, and his father began tutoring him on the basics of bookkeeping and maintaining financial records.

Jeff developed an early passion for music that was purely his own. When he first became interested in playing the drums during the fifth grade, he crafted his own drum kit from cardboard boxes and ice cream barrels. His parents soon recognized that it was a serious pursuit and bought him a set of drums and lessons. After learning the drums, he taught himself the piano and guitar. In eighth grade, Jeff was chosen to be one of two percussionists to perform with the California State Orchestra. He played in several bands during middle and high school, one of which went on to record original tracks at Capitol Records and put the earnings towards his future college tuition.

Honorable Kenneth M. Karas, U.S.D.J.
Re: *United States v. Jeffrey Crossland*, 19 Cr. 645
April 20, 2022
Page 3

Jeff graduated from USC with a Bachelor of Science degree in Business Administration in 1978 and a Master of Business Taxation in 1980. While an undergrad, he worked as a summer associate for Arthur Young & Co. (which later became Ernst & Young) and secured future employment as a specialist in the tax department. After college, he enrolled in a master's program at USC but continued to work at Arthur Young full-time to save money for business school. During his tenure at the firm, Jeff was one of six employees chosen nationwide for a one-year rotation at Arthur Young's company headquarters in New York City. Although he rose rapidly to the title of Vice-President, he felt the tax work was too limiting and left in 1983 to attend Harvard Business School.

A few months before heading to Cambridge, a colleague introduced Jeff to his future wife, Linda Williams. They maintained a bi-coastal relationship while he worked toward his MBA and married in 1987. In the early 1990s, Linda began abusing synthetic methamphetamines and alcohol. The drug was such an epidemic across the U.S. at that time that it was called the "crack of the 1990s". California had such an extraordinarily high rate of synthetic "meth" production that it was designated a "source country" for the drug by the DEA akin to what Colombia was for cocaine.[1] Linda attempted to hide her drug use from her husband, but Jeff knew that substance abuse was at the heart of her erratic behavior and grandiose ideas, and her hallucinogenic episodes were the product of drug abuse. He twice enrolled her in a 30-day detox program but with the drug so readily available she quickly relapsed.

After graduating from Harvard, Jeff started working in investment banking at Prudential Securities, where he spent the next fifteen years. Investment banking was a fledgling division with minimal oversight at Prudential. In an effort to compete in the great "bull market" of the 1980s with the large brokerage houses, Prudential cobbled together a securities division of nearly 1,000 employees by acquiring a slew of smaller firms. The job was high-stress and high-stakes, with long days and few non-working weekends. Coupled with the ordeal of living with Linda's addiction, Jeff felt as if he was always "swimming upstream." Jeff tried to reach out to Linda's parents, but they could not acknowledge the severity of her problem and were too elderly to help. The Crosslands had a housekeeper with whom they had become close over the years, and Jeff relied on her to watch over Linda as her drug problem became progressively worse. On one occasion, Linda got into a confrontation with law enforcement and was put into a 72-hour involuntary mental health hold, which was extended for a few weeks because of the risk that she would harm herself. Mr.

---

[1] *See* Congressional Record, March 12, 1996, 104th Congress, pp. S1855-S1869, *available at* https://bit.ly/3E1wEKh. Congress subsequently passed legislation introduced by Senator Orrin Hatch called the Comprehensive Methamphetamine Control Act of 1996, which was signed into law On October 3, 1996.

Crossland recalled that on the day she was released from the hospital, she seemed as disconnected from reality and her circumstances as she had been before.

The housekeeper reached a breaking point when Linda returned home from a trip and erupted in an emotional tirade. After a barrage of verbal abuse, the housekeeper drove Linda to Jeff's office and resigned. As Jeff was driving Linda home, she jumped out of the car with their small dog in tow and ran into a hotel. She was asked to leave by security and responded with a swing, landing her in women's lock-up and the dog (briefly) impounded. The incident finally served as a wake-up call and, as Jeff recalls, she appeared to "come around" afterward. However, in May 2003, Jeff returned home from the office to find Linda lying on the floor next to the bed. He tried to revive her, but she was unresponsive. The toxicology report later concluded that she had a massive heart attack in the early to mid-afternoon, likely a result of methamphetamine abuse.

Jeff's professional life was more auspicious. After 11 years at Prudential, he was promoted to the position of Managing Director of Western Real Estate. Ted Fundoukos, who worked under him at Prudential and later became his business partner, cites Jeff as the reason he chose to join the real estate group at Prudential:

> All the other Managing Directors had leadership flaws, and Jeff really cared for his subordinates. His emotional intelligence was off the charts. He was always there to help with your development, gave you credit when you did well, and when things were not going well, he took the blame for it and covered us all from any negative reviews…. Year after year, he was caring, unselfish and conducted himself with integrity and character."

Exhibit B (Letter of Ted Fundoukos). Mr. Fundoukos recounts how Jeff remedied a situation where Mr. Fundoukos's bonus was 15% below what Jeff told him it would be after his performance review. He writes, "the Managing Director…said he must have made a mistake when he told me the original amount. Well, Jeff found out about it and, unable to get the company to honor it, he paid me from his own bonus. That was the kind of person he was — always looking out for others." *Id*.

In 2000, Prudential closed its securities division. Jeff and Mr. Fundoukos started a broker-dealer, Crossland Capital Partners, LLC, as equal partners, and Jeff focused his business on individual clients with real estate portfolios. In 2005, Jeff married Alice Longoria. He had known Alice for several years from a local gym they both belonged to, and they started dating in the year following Linda's death. That same year, Jeff and Mr. Fundoukos teamed up with three other individuals to start

Honorable Kenneth M. Karas, U.S.D.J.
Re: *United States v. Jeffrey Crossland*, 19 Cr. 645
April 20, 2022
Page 5

a real estate development venture. The five partners, each of whom invested $100,000 and maintained a 20% share of the company, sought to capitalize on a gentrification effort taking place in downtown St. Louis, Missouri. The area had a large stock of turn-of-the-century buildings that had fallen into disrepair, and, at that moment, there was political capital behind its restoration. The group acquired a ten-story, late 1800s building and converted it into a complex of 95 condominiums with commercial retail space on the ground floor. Ms. Longoria, an attorney who had left her litigation firm a few years earlier, assisted with the marketing and sale of the condominiums. The project earned the group a total profit of $5,000,000.

Jeff and three of the partners decided to acquire a second building for development into an apartment complex. They negotiated a loan through the same banker (at a different institution) as the first project and they each executed a personal guarantee. They had just completed the interior demolition of the building in 2008 when Lehman Brothers defaulted, and the economy collapsed. Jeff's development project was among the many that lost funding in the fallout. The partners disbanded, but Jeff attempted to salvage the project through a Chapter 11 bankruptcy proceeding but the effort failed, and the lender moved to enforce Jeff's personal guarantee.

By 2009, Jeff was in his mid-50s and was unemployed, trading his own securities portfolio to support himself and his wife. He considered going back to an accounting firm, but it didn't seem viable, given the pool of youth he would be competing against, and the work no longer interested him. By 2013, he had depleted his retirement savings and was accumulating debts and liabilities. That June, Jeff's father passed away from a heart attack and, a few weeks later, he and Ms. Longoria separated. He connected with an individual he knew from his days at Prudential who had started a financial services firm in New York City. That individual introduced Jeff to the idea of alternative financing using offshore banks and standby letters of credit (SBLCs). Mr. Crossland knew nothing about SBLCs but, after having been burned by the U.S. banking system, was convinced that it was a legitimate "new model" for loan financing. His colleague from Prudential connected him with another individual who claimed to have successfully obtained SBLCs and through him, Jeff met Stephen Parente and Mr. Robinson.

## The Sentencing Guidelines and
## The Probation Department's Recommendation

Mr. Crossland's Stipulated Guidelines Range of 51 to 63 months' imprisonment, as per the plea agreement, is calculated as follows:

Base Offense Level, §2B1.1(a)(1).............................................................7

    Loss Amount, §2B1.1(b)(1)(J) between $3,500,000 and $9,500,000......18

    Offense involved ten or more victims, §2B1.1(b)(2)(A)(i) .........................2

    <u>Acceptance of responsibility, §3E1.1(a) and (b)</u> ..................................... -3

    Total Offense Level ..............................................................................24

This is Mr. Crossland's first arrest and conviction, and he is in Criminal History Category I. The Probation Department concurs with the above Guidelines calculation and has recommended a downward variance to a sentence of 24 months. PSR, p. 38. The Probation Department noted that, at 65 years old, Mr. Crossland "is a first-time offender who appears to have otherwise been a law-abiding and contributing member of society, thereby evincing that his participation in this crime truly represents aberrant behavior." *Id.* at p. 39. Probation also noted that Mr. Crossland has "acknowledged the harm caused to the victims as a result of his actions and expresses regret and remorse for his criminal conduct." *Id.*

## The Factors Under 18 U.S.C. § 3553(a) Support the Imposition of a Two-Year Sentence

A. <u>The Nature and Circumstances of the Offense and Mr. Crossland's History and Characteristics</u>

Mr. Crossland pled guilty to participating, between 2013 and 2015 with co-defendants Raymond Robinson and Stephen Parente, in a plan to provide loans to several churches that were seeking to finance construction projects on their property. Mr. Robinson was a minister who worked in the church building business and who used his membership in the church community to solicit business opportunities. Mr. Robinson and Mr. Parente, who had a financial advisory business, had teamed up to market construction loans to churches that were unable to obtain conventional bank loans. Mr. Parente brought in Mr. Crossland as someone who could arrange alternative loan financing for the churches.

Mr. Crossland's plan involved using loan deposit funds from the churches to secure a line of credit, which would then be invested overseas by a renowned currency trader named Andrew Krieger. PSR, ¶ 13. Mr. Krieger had a storied career working for Solomon Brothers, Banker's Trust, and George Soros, and is largely acknowledged to have executed one of the top five or ten foreign exchange trades in history. Following the Black Monday crash of 1987, Mr. Krieger sold the New Zealand dollar "short" and, when the price of the "Kiwi" dropped by 5%, he netted a $300 million

Honorable Kenneth M. Karas, U.S.D.J.
Re: *United States v. Jeffrey Crossland*, 19 Cr. 645
April 20, 2022
Page 7

profit for Banker's Trust.[2] Thirty-five years later, Mr. Krieger's reputation still precedes him.[3] Krieger's agreement (through a third party) to invest the deposit money gave Mr. Crossland a wildly unrealistic expectation of generating the funds necessary to support the projects. Indeed, Krieger promptly used the initial $1 Million to pay his taxes.

Despite his misplaced confidence that the funding would come through, Mr. Crossland agreed with Robinson and Parente not to disclose to the churches that their loan deposit would be "seed money" used to generate the loan funds because the churches would likely walk away from the agreement. *Id.* at 13-15. The financing plan failed, and four of the five borrowers never recovered any of their deposit money. The loan scheme was set up so that Mr. Crossland would not make any money unless the borrowers got their loans. The deposits were used in the unsuccessful effort to obtain the loans and other than $37,000 in fees paid by the lenders at the start of the process, Mr. Crossland did use any of the victim's deposit money to elevate his lifestyle or acquire things he would not have otherwise been able to afford.

Mr. Crossland's criminal conduct does not align with how he led his life before the offense. He has no prior criminal history, he has been a productive member of society, and he has been an engaged member of his community. When counsel urged Mr. Crossland to ask people if they would write letters for him, it became clear to us that he was too ashamed of his conduct to ask for their help. It took him a long time to broach the topic of his case with his siblings, because the shame caused him so much anguish. The individuals he did ask for letters, at counsel's persistent urging, all expressed complete shock that he was in this situation. As Mr. Fundoukos writes,

> As a friend, I cannot count how many times he has helped me. From writing recommendations for me for jobs and post graduate degrees to explaining to me complex legal, finance and real estate concepts. He is a patient mentor and true friend. As a family man, he has financially supported his brother Bud [Paul] for years and was always there for his siblings and parents. Jeff's character is not a reflection of how he treats me — it's apparent in how he

---

[2] *See* Beattie, A. "The Greatest Currency Trades Ever Made," Investopedia, last updated January 29, 2022, *available at* https://bit.ly/3rt8bIF

[3] *See also* "Andy Krieger's Most Infamous Forex Trades," Business & Leadership, February 19, 2020, *available at* https://bit.ly/3uJSYoU; "Andy Krieger: the Currency Trading Genius," Trading Education, last updated July 23, 2021, *available at* https://bit.ly/37kCXN9; and "Andy Krieger: the Undisputed Trading Ninja," NL Brand Reviews, April 3, 2022, *available at* https://bit.ly/37ni3wJ

> treats every single person he comes into contact with. In my long experience being a part of his personal and professional life, I have had every opportunity to witness flaws in his character, and I know he would never put selfish gain over the interests of another person. His entire life has been dedicated to being a person of kindness and integrity.

Exhibit B.

Cynthia Crossland describes her older brother as "kind to a fault," someone who steps in to alleviate rather than exploit a situation. His brother Jim remarked upon Mr. Crossland's support and dedication to both of his spouses — Linda amid her years of drug abuse and failed attempts at rehab, and Alice after she decided to stop working, while he supported them with his retirement savings. According to Jim, situations that would have sent other spouses running for the hills did not shake Mr. Crossland's devotion to them; he did not once mention divorce. In his letter to the Court, Jim describes how Mr. Crossland has shown the same dedication to their brother Paul:

> Our brother Paul Crossland who is 62 years old has serious emotional problems that affect how he functions in the world. Paul can't hold down a job because of his problems and is too proud to seek help or government assistance. Paul lived with our parents all but about 1 year of his life... Paul has relied heavily upon Jeff all his life and they have a special bond. I would venture there hasn't been a day in his 62 years where Paul hasn't talked with Jeff. ... My major concern is how Paul will survive while Jeff is incarcerated. At this point, Jeff is all he has.

*See* Exhibit C (Letter of Jim Crossland).

Cynthia writes that he "couldn't have been a better role model, mentor, and advisor to me, my siblings, and even my parents. He was a focused, high-achieving student, athlete, and talented musician and a caring, generous, and supportive friend and big brother to an emotionally challenging sibling." Exhibit D (Letter of Cynthia Crossland). Ms. Crossland remembers how proud she felt to be Mr. Crossland's sister when she went to visit him at Harvard and learned from his classmates that he had been holding "office hours" for anyone who wanted help learning accounting:

> His undergrad major in accounting made him the "resident expert" and he took the time from his own studies to help others struggling in this class. They were so eager to tell me about his generosity, I was struck by their enthusiasm and so proud to be his sister.

*Id.*

One of those classmates, Alex Liu, has remained friends with Mr. Crossland since their first year at Harvard. Exhibit E (Letter of Alex Liu). Mr. Liu is the managing partner and chairman of the fourth-largest global management consultancy company, Kearney. He writes that Mr. Crossland tends to "'step in,' where there is a greater benefit for multiple folks," citing as an example the time that Mr. Crossland "voluntarily compil[ed] research during business school for all his classmates re: the federal tax deductibility of tuition and related expenses and shar[ed] those insights in a broader school assembly, on his own time…." *Id.* He adds that after he and his Harvard classmates finished their case prep for "the next morning's never-ending, anxiety-inducing cold call drill," Mr. Crossland would "spring out his Canon pocket accordion" and sing Elton John to calm them all down. *Id.*

Kirk Hallam, a civil litigator in Los Angeles who has been friends with Mr. Crossland since the age of 12, began engaging him as a forensic accountant in civil cases approximately five years ago. Knowing Mr. Crossland in both a personal and professional capacity, Mr. Hallam writes:

> Whether Jeff is interacting with a professional colleague or an administrative assistant, a bartender, a waiter or a retail clerk, his demeanor remains the same, friendly, courteous and engaging, always respectful, often expressing genuine interest in those he comes in contact with, qualities he inspires others to emulate, including and especially myself. I can say with absolute certainty that Jeff is not and has never been a user, a taker, a manipulator or a scammer, and I have met plenty of those in my 40-year legal career. He is a caretaker and a giver, as demonstrated by his everyday interactions with ordinary people as well as his long-term care for his financially and emotionally dependent brother Paul ("Bud"), and for both his long-suffering and now deceased mother and his first wife.

*See* Exhibit F (Letter of Kirk Hallam).

In the few years leading up to this offense, Mr. Crossland was struggling to reinvent himself. He valued outside-of-the-box ideas and strategies and did not want to resign himself to the conventions of the corporate finance world once again. Having enjoyed success at a certain level, and under desperate financial constraints, he started to grasp at whatever opportunity had potential. Mr. Crossland ultimately substituted confidence in his own skills for due diligence and good judgment. He wanted the church-funding plan to succeed because his own fortune was tied to it. He succumbed to magical thinking when he thought Krieger was on board, far from the kind of thinking he had cultivated as a financial professional. He has written to each victim to express his remorse and is committed to making them whole to the extent he is able.

In determining the appropriate sentence, we ask the Court to consider that the instant offense was a gross deviation by an otherwise intelligent, responsible, caring, generous, and hard-working individual.

> B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment

The Supreme Court has cautioned that although a sentencing court should begin with a determination of the applicable Guidelines range, it "may not presume that range to be reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007), *citing United States v. Rita*, 551 U.S. 338, 127 S. Ct. 2456 (2007). The court's determination of the appropriate sentence must examine "all of the § 3553(a) factors...[and] make an individualized assessment based on the facts presented." *Id.* Ultimately, "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime" (*United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc)) as long as that sentence is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. *See* 18 U.S.C. § 3553(a).

> 1. *A Downward Variance is Appropriate Because U.S.S.G. § 2B1.1 is Not Based Upon Empirical Data, is an Unreliable Guidepost and Generally Overstates The Seriousness of the Offense*

Although the Guidelines are the "starting point and the initial benchmark" (*Gall*, 552 U.S. at 49) in determining a defendant's sentence, the Supreme Court has recognized an exception to that principle when the applicable Guideline not based on "empirical data and national experience." *Kimbrough v. United States,* 552 U.S. 85, 109-10 (2007). Courts, academics, and even the Commission have recognized that

the Guidelines' draconian loss table was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices but in response to a call for more regulation in the wake of large financial frauds.[4] Consequently, Section 2B1.1 "routinely recommends arbitrary, disproportionate, and often draconian sentences to first-time offenders of economic crimes...driven primarily by Section 2B1.1's current loss table, which has an outsized role in determining the length of [the] sentence." *Id*. The precipitous ascent of the enhancements as the loss amount increases is "rooted in the assumption that the larger loss frauds tend to be more sophisticated, affect a larger number of victims, result in greater illicit gains, and involve an abuse of one's position of power." *Id*. However, Section 2B1.1 has additional enhancements that account for these facts, effectively penalizing a defendant twice for the same conduct.

Many judges in this Circuit have severely criticized Section 2B1.1.'s loss table and recognized that a significant downward variance from the Guideline range is appropriate under such circumstances. *See*, *e.g.*, *United States v. Lumiere*, No. 16 Cr. 483, (S.D.N.Y. Jun. 14, 2017) (Rakoff, J.)("Ridiculous, absurd, barbaric" and "bear[ing] no relationship" to "any of the factors set forth in Section 3553(a).")(Sentencing Tr. at 28); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2013) (varying from the Guidelines because they place an "inordinate emphasis...on the amount of actual or intended loss."); *United States v. Johnson*, No. 16-cr-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. April 27, 2018) (same); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.) (A "black stain on common sense.") The disproportionate enhancements in 2B1.1's loss table and the anchoring effect of the guidelines have particularly severe consequences here. Two-thirds of Mr. Crossland's total offense level stems from the 18-level enhancement from the stipulated loss of $3,601,950 million (which is far closer to the top of the 16-level loss range ($1.5M to $3.5M) than it is to the top of the applicable 18-level loss range of $3.5 million to 9.5 million). The stipulated Guidelines level of 24 (including the 3-point reduction for acceptance of responsibility) with a Guidelines Range of 51-63 months is overly punitive for a first-time, non-violent offender, even before consideration of the § 3553(a) sentencing factors.

Viewed in this context, a downward variance to a term of no more than 24 months' imprisonment is not disproportionate. According to statistics generated by the U.S. Sentencing Commission's Interactive Data Analyzer (IDA), of the 32 reported cases from the fiscal year 2017 through 2021 with demographically similar

---

[4] *See* Barry Boss and Kara Kapp, How the Economic Loss Guideline Lost its Way, and How to Save It, Ohio St. J. Crim. Law. Vol: 18.2: 605-631 (Spring 2021) (hereinafter, "Boss/Kapp").

Honorable Kenneth M. Karas, U.S.D.J.
Re: *United States v. Jeffrey Crossland*, 19 Cr. 645
April 20, 2022
Page 12

defendants, courts in this district issued sentences of up to 24 months 56.3% of the time.[5]

    C. To Protect the Public from Further Crimes of the Defendant, and to Provide Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment In the Most Effective Manner

A 24-month term of imprisonment will adequately fulfill the goals of sentencing. According to a 2017 report by the United States Sentencing Commission, Mr. Crossland is considered at very low risk for recidivism.[6] Recidivism information is "central" to the three objectives of sentencing that focus on "prevention of future crimes through correctional intervention," which are specific deterrence, incapacitation, and rehabilitation. *See* Report at p. 2. As noted in the Report, recidivism rates decrease with age and level of educational achievement and increased with the Criminal History Category of the offender. *Id.* at 30. For Mr. Crossland is over 60 years old, has a post-graduate degree, and is in Criminal History Category. Mr. Crossland also has the support structure that facilitates a transition back into society through his brother, Jim, and sister, Cynthia, who are accomplished in their respective careers and have offered to assist Mr. Crossland by whatever means necessary upon his release from incarceration.

    D. Deterrence

Research has also shown that: 1.) sending an individual convicted of a crime to prison is not a very effective way to deter crime, and 2.) increasing the severity of punishment does little to deter crime.[7] In summarizing decades of research data on the subject, Professor Daniel Nagin of Carnegie Mellon University, a highly regarded criminologist and statistician concluded:

---

[5] The parameters entered into IDA were: Fiscal Year: 2017, 2018, 2019, 2020, 2021; Circuit: 2nd Circuit; State: New York; District: New York, Southern; Race: White; Gender: Male; Age: Over 60; Citizenship: U.S. Citizen; Education: College graduate or more; Crime Type: Fraud/Theft/Embezzlement; Guideline: § 2B1.1; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: Exclude Career Offenders.

[6] *See* United States Sentencing Commission, "The Effects of Aging on Recidivism Among Federal Offenders," December 2017 (the Report), *available at* https://bit.ly/3jMDk5w

[7] National Institute of Justice, "Five Things About Deterrence," May 2016, available at https://www.ojp.gov/pdffiles1/nij/247350.pdf

Honorable Kenneth M. Karas, U.S.D.J.
Re: *United States v. Jeffrey Crossland*, 19 Cr. 645
April 20, 2022
Page 13

> [L]engthy prison sentences cannot be justified on deterrent grounds, but rather must be justified either on crime prevention through incapacitation or on retributive grounds. The crime prevention efficiency of incapacitating aged criminals is dubious and thus the case for lengthy prison sentences must rest on retributive considerations.[8]

The need for punishment and general deterrence (as elusive as that goal may be) should be weighed against the total sum of Mr. Crossland's accomplishments in life, his history and character, and his past and future contributions to society. In *Gall v. United States*, 552 U.S. 38, 59 (2007), the Supreme Court held that the 3553(a) factors supported the district court's finding that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Id.* at 54. Mr. Crossland has been steadily working to get his life back on track. He has been offering tax preparation and consultation services in addition to his forensic accounting work for Mr. Hallam for income. He has continued to be involved in his local Catholic parish, through which he recently volunteered to provide support for senior citizens living in convalescent homes. Mr. Crossland has also volunteered to prepare tax returns or provide tax consultation services without compensation to nine organizations/individuals.

Incarceration is not the only form of punishment Mr. Crossland will have endured. He will carry the stigma of being a felon and suffer from its real-world consequences for the rest of his life. The label will affect the very thing that has defined him — his drive to work and be productive. The Council of State Governments Justice Center, a national, nonprofit, nonpartisan, criminal justice organization that represents state officials in all three branches of government, has found that "[c]ollateral consequences that limit employment opportunities account for over 70 percent of the 40,000-plus consequences cataloged in the NICCC [National Inventory of Collateral Consequences of Conviction]."[9] In addition to the more well-known aspects, such as limiting or otherwise disincentivizing employers from hiring and the inability to obtain a professional or occupational license, individuals with

---

[8] Nagin, D.S. 2013. "Deterrence in the 21st Century: A Review of the Evidence." In M. Tonry, ed., *Crime and Justice: An Annual Review of Research*. Chicago: University of Chicago Press.

[9] *See* Chidi Umez and Joshua Gaines, *After the Sentence, More Consequences: A National Report of Barriers to Work* (New York: The Council of State Governments Justice Center, 2021).

prior felony convictions are often unable to obtain a business license necessary for self-employment and face industry-related limitations. *Id.*

Lastly, we respectfully ask the Court to consider Mr. Crossland's physical health when determining the length of his sentence. As noted in the PSR, Mr. Crossland was diagnosed with "benign prostatic hyperplasia" in April 2018, for which he underwent corrective surgery in November 2021. He also takes daily medication for high blood pressure which continues to be a risk factor for developing "severe illness" from Covid-19. *See* Centers for Disease Control, "People with Certain Medical Conditions" (last updated Feb. 25, 2022) *available at* https://bit.ly/3jMDk5w. We now know that Covid-19 is unlikely to be eradicated and will continue to pose a significant threat to inmates with underlying comorbidities such as hypertension.

Serving a prison term entails all of the deprivations that go along with confinement and its daily humiliations; serving a prison term during times of Covid takes it up another notch, or two or three. Hundreds of inmates and hundreds of staff currently have confirmed positive test results for COVID-19. COVID-19 Coronavirus , Federal Bureau of Prisons (Mar. 7, 2022) , available at: https://www.bop.gov/coronavirus/.

E. <u>The Kinds of Sentences Available; the Kinds of Sentence And the Sentencing Range Established for the Applicable Category of Offense</u>

There is no mandatory minimum in this case and the Court has all sentencing options at its disposal.

F. <u>The Need to Avoid Unwarranted Sentence Disparities, to Provide Restitution to Any Victims, and Any Pertinent Policy Statements</u>

Based on nationwide statistics, offenders of theft, property destruction, and fraud offenses received a downward variance of approximately 38% of the time in fiscal year 2020.[10] For defendants who received a downward variance, the average sentence reduction was 58%. In this district in fiscal year 2019, courts gave

---

[10] *See* U.S. Sentencing Commission Quick Facts Theft, Property Destruction, and Fraud Offenses for Fiscal Year 2020, *available at* https://bit.ly/3rAFlGl

Guidelines sentences in only 26.2% of fraud/theft/embezzlement cases, excluding 5K1.1 departures.[11] Some examples of downward variances in recent years include:

- In *United States v. Blaszczal*, S1 17 Cr. 357, Judge Kaplan varied downward from the Guideline ranges for three defendants who were convicted after trial of insider trading after stealing confidential information from the Centers for Medicare and Medicaid Services over a period of six years. Two defendants with Guidelines ranges of 78-97 months received sentences of 36 and 20 months, and a third defendant whose Guidelines range was 63-78 months was sentenced to 24 months plus one day.

- In *United States v. Cooney*, 16 Cr. 371, Judge Abrams sentenced a defendant who was convicted after trial of defrauding a Native American tribal entity and various investment advisory clients of tens of millions of dollars, and who had a Guidelines range of 135-168 months, to 30 months' imprisonment.

- In *United States v. Block*, 16 Cr. 595, Judge Oetken sentenced a defendant convicted after trial of a $315,000,000 securities fraud, who had a Guidelines range of life and a Probation Department recommendation of 84 months' imprisonment, to 18 months.

- In *United States v. Ahmad Naqvi*, S1 16 Cr. 356, Judge Ramos sentenced a defendant who pled guilty to conspiracy after starting an investment fund and defrauding investors out of $18 million, some of which was used to buy personal luxury goods, and who had a Guidelines range of 60 months (the statutory maximum) to 15 months.

The above cases suggest that courts in this district have found that the Guidelines offer less utility as a "starting point and initial benchmark" (*Gall, supra*) in fraud cases than in other cases.

---

[11] *See* U.S. Sentencing Commission Statistical Information Packet for Fiscal Year 2019, Southern District of New York, at Table 10, *available at* https://bit.ly/3jMDk5w

Case 7:19-cr-00645-KMK Document 122 Filed 04/20/22 Page 16 of 16

Honorable Kenneth M. Karas, U.S.D.J.
Re: *United States v. Jeffrey Crossland*, 19 Cr. 645
April 20, 2022
Page 16

## Conclusion

We respectfully submit that a sentence of no more than 24 months' imprisonment will serve the goals of sentencing and is sufficient but no more than necessary to promote those goals

The Court's consideration of this letter and attachments is appreciated.

Respectfully submitted,

S/

Susan C. Wolfe
Diane M. Fischer

*Attorneys for Jefferey Crossland*

Enclosures

cc: AUSA Margery Feinzig